LAND, J.
 

 During the month of May, 1921, the Commercial Lumber Company of Rapides parish was placed in the hands of J. P. Turregano, as receiver, by order of the Ninth district court 'of that parish, with authority granted to the receiver to operate the company as a going concern.
 

 Under order of court of date July 2, 1921, the receiver was authorized to borrow money to carry on the affairs of the Commercial Lumber Company, and for that purpose to issue receiver’s certificates, bearing interest not to exceed 8 per cent, per annum, in the amount of $15,000, and to be issued as provided by section 5 of Act No. 159 of 1898, as amended by Act No. 199 of 1914.
 

 The Commercial Bank, under loans made by it to the receiver, acquired two of these certificates, each for the sum of $4,687.50, or a total of $9,375, dated respectively July 22, 1921, and August 12, 1921, with 8 per cent, per annum interest from October 15, 1924, until paid, anS 10 per cent, of the principal and interest as attorney’s fees.
 

 Tlie Alexandria Bank, under loans made by it to the receiver, also acquired two of these certificates, each for the sum of $2,812.50, or a total of $5,625, with 8 per cent, per annum interest from October 15, 1924, until paid, and 10 per cent, of the principal and interest as attorney’s fees.
 

 The respective certificates acquired by the banks are made payable to the order of each, and are indorsed by nine defendants, who constitute all or the main stockholders of the Commercial Lumber Company.
 

 Plaintiff banks seek, in separate suits, to obtain judgments against all of the defendants in solido in the respective amounts alleged to be due to each bank, with 8 per cent, per annum interest thereon from October 15, 1924, until paid, together with 10 per cent, of the principal and interest as attorney’s fees.
 

 Judgments were rendered for the banks against defendants in the lower court, as prayed for, with the exception of John R. Stanley, and the defendants east have appealed.
 

 1. As the issues are identical, the two causes have been consolidated for the purposes of trial and appeal.
 

 All defendants, except the receiver, filed exceptions of no cause of action. These exceptions were overruled, except in the case of John R. Stanley, and as to him the exception was sustained. As no appeal has been taken by plaintiff banks from the judgments sustaining Stanley’s exception, he has passed out of the case.
 

 2. The main defense to these suits is urged under exceptions of no cause of action. Defendants contend that their indorsement of
 
 *434
 
 these certificates did not hind any of them personally, as the certificates are nonnegotiable instruments; and that their obligation as indorsers was no greater than that of the receiver, which was to pay the indorsed certificates out of receivership assets; and, since the receivership assets were insufficient to pay these certificates, that their responsibility ceased.
 

 It is conceded by plaintiff banks that the receiver’s certificates are nonnegotiable because, instead of being payable on a certain day, they are payable in the course of administration.
 

 However, the settled and uniform jurisprudence of this state is that, if a man puts his name on the back of a note or other instrument, not negotiable, the presumption is that he meant thereby to become á surety for the payor. Cooley v. Lawrence, 4 Mart. (O. S.) 639; see, to the same effect, a long list of decisions, 1 La. Dig. page 922, verbo “bills and notes” § 111.
 

 On July 19, 1921, the defendants, as indors-' ers of these certificates, entered into and signed an agreement between themselves reading as follows: “As indorsers of the Receiver’s certificates of indebtedness of the Commercial Lumber Company, Inc., aggregating $15,000.00 in favor respectively of the Commercial Bank & Trust Company, of Alexandria, La., and of the Alexandria Bank & Trust Company, we agree among ourselves that any loss resulting to us, or any of us, from such indorsement, shall be borne by and prorated among us in the proportion of the number of shares of capital stock of said corporation owned by us.”
 

 On September 29, 1921, the receiver and all of the indorsers of the certificates herein sued upon, with the exception of J. R. Stanley, entered into an agreement with the two plaintiff banks.
 

 In that agreement they declared: “Whereas, since and during said receivership the Receiver has borrowed from said Banks the principal sum of $15,000.00 on Receiver’s certificates endorsed by. * * * ” Here follows the list of names of all the defendants as indorsers.
 

 “Whereas, said Receiver and the stockholders of said company require further loans for the conduct of the affairs of said receivership and desire said banks to advance said Receiver,” etc. •
 

 “Said endorsers are willing to subordinate any lien or privilege which they may have as endorsers on said Receiver’s certificates of $15,000.00,” etc.
 

 And they agree that: “All present and future indebtedness incurred by said Receiver in favor of said banks shall prime any lien or privilege that said Receiver’s certificates of $15,000.00 now enjoy, or that the endorsers of said Receiver’s certificates, or any future holders of said Receiver’s certificates now or may hereafter enjoy to secure payment of said certificates.” •
 

 In our opinion, the agreements, signed by these defendants on July 19th and September 29, 1921, constitute a written acknowledgment of personal liability upon their part, through the writing of their names upon the back of the receiver’s certificates herein sued upon. It was upon the avowed ground that the receiver “and the stockholders” of the lumber company “required further loans” that defendants subordinated the lien and privilege, securing the certificates indorsed by them, in order to procure these very loans.
 

 And in the face of the express agreement, of July 19, 1921, to divide and prorate among
 
 *436
 
 themselves the loss resulting from the indorsements, defendants’ contention that their obligation went no further than to pay, if the assets were sufficient, has not a leg upon which to stand. It is elementary that the obligation of the surety is to pay, if the debt- or does not pay. Rev. Civ. Code, arts. 3035, 3045, 3051. “Signatures to obligations are not mere ornaments.” Snell et al. v. Union Sawmill Co. et al., 159 La. 608, 105 So. 728, 730.
 

 3. It is also contended by counsel for defense that plaintiff banks cannot take the position that the indorsers are sureties, because they are sued eo nomine as indorsers.
 

 Plaintiff banks have set forth at large, in their petitions, all the instruments and indorsements relied upon; If defendants, under the facts stated, are sureties in law, the erroneous conclusion of plaintiff banks that they are indorsers is not binding. As said in Continental Supply Co. v. Fisher Oil Co., 150 La. 892-893, 91 So. 287: “The contention that Zigler, having been sued as indorser, cannot be held liable as surety, is without merit; that was a mere conclusion of law from facts stated, which show the contrary. Mere conclusions of law do not bind the pleader when the facts alleged show such conclusions to be erroneous.”
 

 4. As defendants are sureties, they are bound in solido. Rev. Civ. Code, arts. 2091, 3049, 3050.
 

 5. Although a surety may demand the right of division, as done in these suits, defendants lost that right because W. R. O’Neal, their cosurety, had become insolvent before the plea was made by defendants, as shown by his own testimony. Volume 3, pp. 99,100, 101, and by the list of judgments against him set forth in Plaintiffs’ Exhibit Y, vol. 2, p. 48. Metropolitan Bank v. Muller et al., 50 La. Ann. 1278, 24 So. 295, 69 Am. St. Rep. 475; Rawlings, Duncan & Co. v. Barham, 12 La. Ann. 630, 631; Parker v. Guillot, 118 La. 223, 227, 42 So. 782; Rev. Civ. Code, arts. 3049, 3050.
 

 On the Merits.
 

 6. The preponderance of the evidence shows that these certificates were indorsed when negotiated with the bank.
 

 7. The remaining defenses urged relate to the alleged faults, omissions, and mismanagement of their codefendant J. P. Turregano, which, defendants assert, resulted in insufficient funds to pay all the receiver’s certificates and the mortgage indebtedness.
 

 The receivership was a matter of public record and lasted several years. Defendants made no appearance in court to oppose any action, financial statement, or account of the receivership. No more blame is to be attributed to plaintiff banks than to the defendants, the indorsing stockholders.
 

 On May 16, 1921, the Commercial Lumber Company had assets of the appraised value of $110,707.48, of which $50,157.50 was represented by lumber on yards, aggregating 1,-567,500 feet.
 

 The liabilities of the company aggregated $90,535.36, of which $9,296.07 was due ordinary creditors, and $81,239.29 was due preferred creditors. Among the preferred creditors was J. N. Willett, in the sum of $30,662.-29, secured by chattel mortgage on the lumber on the yards. This debt was fully paid, as a preferential claim by agreement between plaintiff banks and defendants.
 

 The Commercial Bank was also a preferred creditor, in the sum of $25,000, and the Alexandria Bank, in the sum of $15,000 both secured by a mortgage in the sum of $25,000 on mill site and machinery of the company. This
 
 *438
 
 mortgage was executed in favor of the Commercial Bank, but, by agreement between both banks, was made a joint security in the proportion of five-eighths to the Commercial Bank and three-eighths to the Alexandria Bank.
 

 On May 30, 1921, the receiver was authorized to borrow $15,000 on certificates to buy logs and operate the mill.
 

 Acting under the authority of this order, the receiver issued the four certificates sued upon herein, aggregating $15,000.
 

 On September 24,1921, the receiver was authorized to borrow $20,000 additional on receiver’s certificates, alleging that he had manufactured during August 537,409 feet of cypress of the estimated value of $23,983.80, at an estimated profit of $9,899.90, and that, to sell the cypress lumber to advantage, it would be necessary to stack it at least 90 days for the purpose of drying.
 

 On September 29, 1921, defendants, the indorsing stockholders, entered into an agreement with plaintiff banks, in which are recited loans of $40,000 by the banks to the Commercial Lumber Company, secured by mortgage; loans of $15,000 by the banks to the receiver, secured by the receiver’s certificates sued upon in this case; and the overdraft of the receiver, J. P. Turregano, for $10,000.
 

 It is then recited in this agreement: “Whereas, said Receiver and the stockholders of said Company require further loans for the conduct of the affairs of said receivership and desire said banks to advance said Receiver the sum of Twentyrfive ($25.00) Dollars per thousand feet on all cypress lumber manufactured at said mill when manufactured and placed in stacks, and in order to increase the margin of security in favor of said banks, said stockholders, or a portion thereof, propose to take additional stock in said Company. in the gross aggregate amount of Ten Thousand ($10,000.00) Dollars, to be paid for in cash; and that, furthermore, said endorsers are willing to subordinate 'any lien or privilege which they may have as endorsers on said Receiver’s certificates of $15,000.00, or may hereafter acquire as holders of said certificates in favor of said banks to the full extent of any indebtedness of said receivership in favor of said banks, now existing or hereafter incurred;
 

 “Now, Therefore, it is agreed between said banks, said Receiver and said endorsers that upon • $10,000.00 additional stock being subscribed and paid for in cash and said cash sum placed in the hands of said Receiver said banks will advance or loan money to said Receiver in the conduct of said receivership in the sum of Twenty-five ($25.00) Dollars per thousand feet on cypress lumber when and as manufactured at said Company’s mill, and that the lien and privilege securing said advances to be made by said banks to said Receiver and all present and future indebtedness incurred by said Receiver in favor of said banks shall prime any lien or privilege that said Receiver’s certificates of $15,000.00 now enjoy, or that the endorsers of said Receiver’s certificates or any future holders of said Receiver’s certificates now or may hereafter enjoy to secure the payment of said certificates; thereby making the present or future indebtedness of the Receiver in favor of said banks secured by first lien and privilege on all the property and effects of said Company except such lumber as is mortgaged in favor of J. N. Willett, and making said indebtedness of the Receiver payable by priority and preference over any claim of the endorsers or future holders of said Receiver’s certificates of $15,000.00 heretofore issued.”
 

 
 *440
 
 Following this agreement, the receiver borfowed $20,000 on receiver’s certificates, petitioned for on September 24, 1921. On November 28, 1921, the receiver asked for authority, and on December 9, 1921, was granted authority by the court to borrow $50,000 on receiver’s certificates.
 

 The receiver had authority to issue receiver’s -certificates in the aggregate sum of $85,-000, and actually issued certificates to the amount of $75,500.
 

 The receivership was not a success. When the receiver’s final account was approved, there remained $34,880 to be applied to receiver’s certificates due both banks.
 

 The result' is that the Commercial Bank will suffer a loss in principal of $42,546.17, even if the bank obtains judgment for $9,375 on the indorsed certificates in these eases; and the Alexandria Bank will sustain a loss of $19,519.17, if it collects in these suits the indorsed certificates in its favor, aggregating $5,625.
 

 Plaintiff banks, therefore, suffered a combined loss of $62,065.34, in their attempt to finance a lumber company brought into existence by these defendant indorsing stockholders, whose receivership they requested the banks to finance.
 

 For want of sufficient funds, no payment was made on the $10,000 of receiver’s certificates due the Commercial Bank, of date July 20, 1924, nor upon the $40,000 mortgage indebtedness due the Commercial Bank and the Alexandria Bank; and all of this indebtedness outranked the $15,000 of receiver’s certificates indorsed by defendants.
 

 8. Defendants contend that they are relieved of liability because the receiver paid the banks a bonus of $4,000 on gross sales of lumber; because an overdraft of $1,053.06 was paid at the Commercial Bank; and because claims of ordinary creditors were compromised and settled for $5,200.
 

 This bonus was agreed to at a meeting between the banks, the receiver, and the stockholders.
 

 As the banks have a combined unpaid in debtedness of $62,065.34, which has priority over the $15,000 of receiver’s certificates, indorsed by defendants, the defendants were not injured by the payments of which they complain.
 

 9. Defendants complain that the banks took chattel mortgages on the lumber on the yards, and permitted the receiver to dispose of the lumber without applying the proceeds to the payment of the subsequently issued certificates. These mortgages were not security for the payment of the certificates of $15,000 indorsed by defendants. Besides, the chattel mortgages taken by the banks were inferior in rank to the statutory lien and privilege, securing the payment of the certificates which the chattel mortgages secured.
 

 In the agreement of September 29, 1921, it was expressly agreed by defendants that the receiver should manufacture cypress lumber, and operate the business as a going concern. No objection was made by defendants to his doing so at any time.
 

 10. Defendants also complain that the banks did not make advances in accordance with the agreement of September 29, 1921, by making advances on lumber “manufactured and stacked,” as set forth in the agreement.
 

 The receiver testified that there was, at all times, sufficient cypress lumber at $25 per thousand feet to support advances made by the banks to the receiver. This statement is verified by the receivership proceedings.
 

 
 *442
 
 11. Defendants finally contend that overdrafts made by jlie receiver were harmful to them.
 

 In their agreement of September 29, 1921, defendants expressly approved an overdraft of $10,000, made by the receiver, and did not stipulate against further advances by overdrafts. They did not require, in this agreement, that advances be made solely on receivership certificates. There was sufficient cypress at $25 per thousand feet, the receiver testifies, to support the overdrafts as they arose in the ordinary course of banking business, and they were met by timely deposit of funds.
 

 Judgments affirmed.
 

 OVERTON, J., recused.